*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL ALLEN TAYLOR,

        Defendant-Appellant.

UNPUBLISHED
February 5, 2019

No. 339721
Macomb Circuit Court
LC No. 2016-000808-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEVIN LEE BLAKE,

        Defendant-Appellant.

No. 339786
Macomb Circuit Court
LC No. 2016-001409-FC

---

Before: STEPHENS, P.J., and K. F. KELLY and TUKEL, JJ.

PER CURIAM.

Defendants, Michael Allen Taylor ("Taylor") and Devin Lee Blake ("Blake"), appeal as of right their June 23, 2017, jury trial convictions for five counts of armed robbery, MCL 750.529, two counts of conspiracy to commit armed robbery, MCL 750.529 and MCL 750.157a, and possession of a firearm during the commission of a felony, MCL 750.227b. Taylor was sentenced to 25 to 26 years' imprisonment for each of the robbery convictions, to run concurrently with one another and consecutive to a two-year term for the felony-firearm conviction. Blake was sentenced to 220 to 360 months' imprisonment for the armed robbery convictions, to be served consecutive to his two-year term for the felony-firearm conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

These cases arise out of the armed robbery of a Domino's Pizza shop and a Subway shop in Warren on November 10, 2015. The robbery of the Subway shop occurred at approximately 9:40 p.m., and the robbery of the Domino's Pizza shop occurred at approximately 10:00 p.m. Samantha Sultz ("Samantha") was working at the Subway shop that night with her coworker, Michael Cohen ("Michael"). Alan Sultz ("Alan"), Samantha's father, was also present at the shop, waiting for Samantha so that he could drive her home. At approximately 9:40 p.m., the door chimed and a person walked into the shop. Samantha turned around to set her phone down so that she could wait on the customer. When she turned back around, she noticed that another person had followed the first person inside. The second person climbed over a half-wall, walked across the cutting boards, and walked toward Samantha. He told her to hand over her cell phone, but she refused. He then told her to open the cash drawer, and she complied. The man was wearing jeans, brown boots, a gray hoodie, and a ski mask. She could tell that the person was a white male, but she was unable to see his face. The first man was also a white male. That man wore the hood of his hoodie up so that his face was mostly hidden. The men left together. Samantha saw the first man swinging a gun back and forth as he walked out.

Alan was sitting at a table when he noticed a man step over the half-wall and saw another man near Michael. The man near Michael had a gun and motioned for Alan to come toward him. Alan identified that man as Blake. Alan testified that Blake was wearing his hoodie up, but that he could see Blake's face. Blake told Alan and Michael to give him their money.

Michael was sweeping and mopping the lobby area when one man entered the shop, followed by another man. The second man wore a mask and climbed over the counter to where Samantha was working. The first man, whom Michael identified as Blake at trial over counsel's objection, had a gun and ordered Michael and Alan to empty their pockets.

A partial shoe impression from the food prep counter at the Subway shop matched a shoe belonging to Taylor.

Jony Ahmed ("Jony") worked as a delivery driver at Domino's Pizza on the night of the incidents. At approximately 9:54 p.m., he returned from making a delivery and parked in the rear of the store. When he got out of his vehicle, two white males approached him, grabbed his shoulder, and turned him around. One of the men had a gun. The man without the gun was wearing a mask covering his face. They asked for money, but Jony told them that he did not have any money. They told Jony to take them into the store and led Jony toward the back of the store with the gun touching his back. Once inside the store, the man with the gun told the people inside the store that if they moved, he would kill them. The man with the mask grabbed money from the cash register.

Amber Smith ("Amber") worked at the Domino's Pizza store on the night of the robbery. She described the robbers as white males. One wore a mask and the other had a baseball cap on. The man wearing the mask approached the cash register and asked Amber to open it. Amber opened the register and stepped back. The man at the register was wearing a white gardening glove with blue dots on the palm. Smith saw the man without the mask pointing a gun toward

her. The man with the mask removed money from the cash register and both men left together through the back door.

The jury watched video footage and still photos from each robbery.

Detroit Police Officer Gary Abair stopped a black Chevy Beretta for having only one functioning headlight. The Beretta initially stopped but then pulled off at a high rate of speed. Abair pursued the Beretta and saw it slow down to allow the passenger to jump out. The person who jumped out was a white male wearing dark-colored clothing. Abair continued pursuing the Beretta, which ultimately stopped in front of a house. Abair identified the driver as Taylor. The passenger, Blake, was apprehended approximately half of a block from where he got out of the car. He was found lying down in a field. Officers recovered a black face mask and a gardening glove from the backseat of the Beretta. Each item contained Taylor's DNA.

Alan, Amber, and Jony viewed a corporeal lineup that had Blake in position 3. Alan selected Blake from the lineup while Smith and Jony selected another individual in position 6.

## II. DOCKET NO. 339721

### A. MOTION TO SUPPRESS TAYLOR'S SHOES

Taylor argues that his constitutional right to be free from unreasonable seizure was violated when the officer in charge, Warren Detective Curt Priemer, took Taylor's shoes while Taylor was in custody on a separate case.

"A court's factual findings at a suppression hearing are reviewed for clear error, but the application of the underlying law—the Fourth Amendment of the United States Constitution and article 1, § 11 of the Michigan Constitution—is reviewed de novo." *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). A finding of fact is clearly erroneous "if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002).

At a hearing on Taylor's motion to suppress, Priemer testified that he encountered Taylor at approximately 10:00 a.m. on November 12, 2015 at the Detroit detention facility off of Mound Road. Taylor was in custody in Detroit because of the fleeing and eluding incident that took place the day after the robberies. At the time, Priemer had reviewed the case file and was aware that a Fubu shoe print was left on the counter during the Subway robbery. He noticed that Taylor was wearing Fubu shoes that fit the description. Primer took the shoes from Taylor.

Priemer did not attempt to get a search warrant. He explained that Taylor was not yet on hold for the robberies. Taylor hadn't been charged and, in fact, wouldn't be charged until November 12, 2015. Priemer knew that Taylor was being held for fleeing and eluding but was under the impression that Taylor was going to be arraigned either that day or the next and that he might receive bond. Knowing that the shoes were "key" to the Subway robbery, Priemer was concerned with preserving them. He felt compelled to seize the shoes. Priemer explained: "Because he was going to go back to his cell. I didn't know what he was going to do with the shoes, damage the shoes, switch the shoes out and at that point he knew that was key evidence at that point because I think we disclosed some things." Priemer did not know if and when Taylor

would be released. Priemer noted that they had "lost" Blake when Blake bonded out November 13, 2015.

In fact, Taylor never was released because he was not able to make bond. Taylor was held for a few days in Detroit and was ultimately transferred to the Warren Police Department, bringing his belongings with him.

During cross-examination, Priemer indicated that he could not specifically remember whether he knew that Taylor was a "parole hold" and that there was no chance he would have been released.

The right against unreasonable searches and seizures is guaranteed by both the United States and Michigan Constitutions. US Const, Am IV; Const 1963, art 1, § 11; *Slaughter*, 489 Mich at 310-311. Generally, a search or seizure conducted without a warrant is presumptively unreasonable unless there exists both probable cause and a circumstance establishing an exception to the warrant requirement. *People v Snider*, 239 Mich App 393, 406; 608 NW2d 502, lv den 463 Mich 855 (2000).

On appeal, Taylor argues for the first time that probable cause was lacking. The existence of probable cause depends upon the totality of the circumstances. *People v Wood,* 321 Mich App 415, 423; 910 NW2d 364 (2017). Probable cause to search exists when facts and circumstances warrant a reasonably prudent person to believe that a crime has been committed and that the evidence sought will be found in a stated place. *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000). Whether probable cause exists depends on the information known to the officers at the time of the search. *People v Beuschlein*, 245 Mich App 744, 749; 630 NW2d 921 (2001).

Under the totality of the circumstances, there was significant probable cause for Premier to believe that Taylor's shoes may have been the shoes that left the footprint at Subway. At the time Premier visited Taylor in jail, Premier had reviewed the file for the robbery and was aware that the footprint was made by an individual wearing "Fubu" shoes. Premier took immediate notice of the fact that Taylor was wearing such shoes.

The next question becomes whether, armed with probable cause to believe that the shoes were critical to the robbery investigation, Premier could seize the shoes absent a warrant. Warrantless seizures are presumptively unreasonable unless shown to fall under one of the exceptions to the warrant requirement. *People v Lemons*, 299 Mich App 541, 545; 830 NW2d 794 (2013). Even if a seizure was impermissible, that does not mean that the evidence resulting from the seizure is automatically excluded. "Generally, if evidence is unconstitutionally seized, it must be excluded from trial. Exclusion of improperly obtained evidence serves as a deterrent to police misconduct, protects the right to privacy, and preserves judicial integrity." *People v Brown*, 279 Mich App 116, 127; 755 NW2d 664 (2008). However, the inevitable discovery doctrine "permits the admission of evidence obtained in violation of the Fourth Amendment if it can be shown by a preponderance of the evidence that the items found would have ultimately been obtained in a constitutionally accepted manner." *People v Hyde*, 285 Mich App 428; 775 NW2d 833 (2009). The inevitable discovery rule allows the admission of evidence obtained in violation of the constitution so long as "the prosecution establishe[s] by a preponderance of the

evidence that the information . . . inevitably would have been discovered by lawful means." *People v Brzezinski*, 243 Mich App 431, 435; 622 NW2d 528 (2000). Three factors must be considered in applying this rule: (1) whether "the legal means [were] truly independent;" (2) whether "both the use of the legal means and the discovery by that means [were] truly inevitable;" and (3) whether "the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection." *Id*. at 436 (citation omitted).

Here, although Premier did not know it at the time, Taylor was never released from jail on the fleeing and eluding charges. Instead, he was transferred to Macomb County after a number of days in the Detroit Mound facility. Because Taylor was never released from custody, all of his personal items, including clothing, would have been processed and seized anyway. Discovery of his shoes was inevitable.

## B. MOTION TO SEVER

Taylor next argues that the trial court abused its discretion when it failed to sever his trial from Blake's and failed to sever the separate charges for each robbery.

"To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). "To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *Id*. This Court reviews for clear error a trial court's findings of fact and reviews de novo the court's application of law to those facts. *Id*. This Court reviews for an abuse of discretion a trial court's ultimate ruling on a motion for severance. *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005). "A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes." *People v Uphaus (On Remand)*, 278 Mich App 174, 181; 748 NW2d 899 (2008).

With respect to the joinder of charges against a single defendant, our Supreme Court has recognized that "[t]he plain language of MCR 6.120 permits joinder if offenses are 'related.'" *Williams*, 483 Mich at 233. "Offenses are 'related' if they comprise either 'the same conduct' or 'a series of connected acts or acts constituting part of a single scheme or plan.' MCR 6.120(B)(1) and (2)." *Id*.

The trial court properly determined that the charges in these cases involved "a series of acts constituting parts of a single scheme or plan." MCR 6.120(B)(1)(c). The charges against each defendant stem from his involvement in the two robberies. The robberies occurred within 15 minutes of each other and only approximately three miles apart. The robberies were similar in that Taylor wore a ski mask and took money from the cash register of each restaurant while Blake held a gun, took money from other individuals, and threatened to shoot if anyone interfered with the robbery. Both defendants left the restaurants together. Thus, defendants' actions involved a series of acts constituting parts of a scheme to rob the two restaurants. Cf. *Williams*, 483 Mich at 235 (charges stemming from November and February arrests related where both cases involved acts constituting part of the defendant's overall scheme to break down

cocaine and package it for distribution); *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014), lv den 497 Mich 982 (2015) (joinder of three cases against the defendant appropriate where his conduct involved "ongoing acts related to his scheme of preying upon young, teenage girls from his high school.")

As for severing Taylor's trial from Blake's, severance under MCR 6.121(C) should be granted only if there exists a serious risk that a joint trial would compromise a specific right or prevent the jury from making a reliable determination regarding guilt or innocence. *People v Hana*, 447 Mich 346; 524 NW2d 682 (1994), amended 447 Mich 1203 (1994). Moreover, severance is mandated under subparagraph (C) only if a defendant provides a supporting affidavit, or makes an offer of proof, that clearly and affirmatively demonstrates that his substantial rights will be prejudiced and that severance is necessary to avoid prejudice. *Id*. Inconsistent defenses are not enough to warrant severance. *Id*. at 349. Rather, the defendants' defenses must be mutually exclusive or irreconcilable. *Id*. "The tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." *Id*. (quotation marks and citation omitted).

Taylor argues that severance is required because the lineup identification of Blake substantially prejudices his rights. As the trial court recognized, both defendants failed to submit an affidavit demonstrating that his substantial rights would be prejudiced by a joint trial. In addition, both defendants maintain that they did not commit the robberies. Therefore, their defenses are not mutually exclusive. Moreover, as the prosecutor notes, in order to prove the conspiracy charges, the prosecutor presented evidence that defendants acted in concert to commit the armed robberies. Accordingly, evidence of the other defendant's conduct would have been admitted in each defendant's trial in any event. The trial court did not abuse its discretion by denying Taylor's motion.

## C. DIRECTED VERDICT

Taylor argues that the trial court erred when it failed to direct a verdict in Taylor's favor on the Domino's robbery charges.

"When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt." *People v Quinn*, 305 Mich App 484, 491; 853 NW2d 383 (2014), quoting *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

> Due process commands a directed verdict of acquittal when sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt is lacking. If the evidence presented by the prosecution in the light most favorable to the prosecution, up to the time the motion is made, is insufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt, a directed verdict or judgment of acquittal must be entered. [*People v Lemmon*, 456 Mich 625, 633–34; 576 NW2d 129 (1998) (citations, quotation marks, and footnotes omitted).]

"Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). "[I]t is not permissible for a trial court to determine the credibility of witnesses in deciding a motion for a directed verdict of acquittal, no matter how inconsistent or vague that testimony might be." *People v Mehall,* 454 Mich 1, 6; 557 NW2d 110 (1997). "Rather, questions regarding the credibility of witnesses are left to the trier of fact." *People v Peña,* 224 Mich App 650, 659; 569 NW2d 871 (1997), mod in part on other grounds 457 Mich 885 (1998).

The trial court properly denied Taylor's motion for a directed verdict as to the Domino's charges. As previously discussed, both robberies were properly considered together as part of a connected series of events. Two men entered the Subway store. The masked individual approached the register and took money while the gunmen held the others at bay. Taylor's footprint was found at the Subway store, positively identifying him as the man in the mask. His accomplice, Blake, was positively identified by two of the victims. Minutes later, the Domino's store was robbed by two individuals with the same modus operandi. Again, the masked individual took money from the register while the gunman held the others at bay. Although witnesses did not positively identify either defendant regarding the Domino's robbery, at least one witness indicated that the masked individual was wearing a white gardening glove with blue dots on the palm. The day after the robberies, both Taylor and Blake were apprehended on fleeing and eluding charges. The car in which they were driving contained a white gardening glove and a mask. Both items contained Taylor's DNA. The circumstantial evidence and reasonable inferences thereto could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt.

## III. DOCKET NO. 339786

## A. SUFFICIENCY OF THE EVIDENCE

Blake argues that there was insufficient evidence to support his convictions.

"A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014).

> But more importantly, the standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. It is for the trier of fact, *not the appellate court*, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences. [ *People v Oros*, ___ Mich ___; ___ NW2d ___ (2018) (Docket No. 156241); slip op at 6.

Blake concedes that the crimes were committed but argues that he was not the perpetrator of either robbery. "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341,

356; 749 NW2d 753 (2008). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *People v Davis*, 241 Mich App. 697, 700; 617 NW2d 381 (2000). But circumstantial evidence and the reasonable inferences that arise from the evidence can also constitute satisfactory proof of identity. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999); *People v Bass*, 317 Mich App 241, 264; 893 NW2d 140 (2016).

Here, there was both affirmative identification of Blake at trial by two witnesses and other circumstantial evidence to support his identity as the gunman for each robbery.

Regarding the Subway robbery, Allen testified that the gunman wore a black hoodie and black pants. Allen could see his face and positively identified Blake at trial as the man with the gun. Allen couldn't remember if he was wearing his glasses during the ordeal, but Blake was less than a foot away from Allen during the robbery and nothing prevented Allen from seeing Blake's face.

Allen had also positively identified Blake during a live line-up several months after the robbery, taking particular notice of the mole above Blake's right eye and the roundness of his face. Allen admitted that he mentioned neither feature in his written statement to police minutes after the robbery. In fact, he only mentioned that the gunman had blonde hair. But this Court should not interfere with the factfinder's role of determining the weight of evidence or the credibility of witnesses. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748, amended 441 Mich 1201 (1992); *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012).

A second eyewitness during the Subway robbery, Michael, testified that he saw a man wearing a dark jacket and dark pants walking towards him. The man pulled out a gun. Michael could see his face and identified Blake as the gunman over defense counsel's objection at trial. Blake asked Michael and Allen to toss their money on the floor. Michael could see his face, though a hoodie partially covered Blake's forehead. Blake picked up the money and then both men left. Michael estimated that the robbery lasted approximately three minutes. On cross-examination, Michael admitted that the first time he identified Blake was at Blake's April 2016 preliminary examination. He did not attend the line-up. In his written statement to police on the night of the robbery, Michael had described the gunman as young with blonde hair and in his early 20's. There was no doubt in Michael's mind that Blake was the gunman. Again, the weight and credibility of Michael's testimony was for a jury to decide.

Given the substantial evidence that Blake was the gunman during the Subway robbery, there was compelling evidence that he was also the gunman during the Domino's robbery. Although no one was positively identified and, in fact, two of the witnesses during the Domino's ordeal actually chose someone else from a corporeal line-up, the fact remains that both Taylor (by his footprint) and Blake (by two positive in-court identifications) were positively identified as the Subway robbers. When they were apprehended the next day on fleeing and eluding charges, they were in a car that contained the white gardening glove with blue dots and a mask. Both items were identified in the Domino's robbery and both contained Taylor's DNA. The men were together, implicating Blake. It is for the trier of fact rather than this Court to determine what inferences can be fairly drawn from the evidence and to determine the weight to be accorded to the inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002); *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013).

There was sufficient direct and circumstantial evidence to support Blake's convictions.

## B. EXCLUSION OF EXPERT ON EYEWITNESS IDENTIFICATION

Blake argues that the trial court erred when it refused to allow Blake to present an expert on eyewitness identification testimony.

"This Court reviews for an abuse of discretion a circuit court's decision to admit or exclude evidence. An abuse of discretion results when a circuit court selects an outcome falling outside the range of principled outcomes. We review de novo constitutional questions and issues of law underlying evidentiary rulings." *People v Kowalski,* 492 Mich 106, 119; 821 NW2d 14 (2012) (footnotes omitted).

At the *Daubert*[1] hearing, Dr. Colleen Seifert testified that she received a Ph.D. in psychology from Yale in 1987. Seifert participated in a post-doctorate fellowship in San Diego involving cognitive science on learning and memory. The fellowship ended in 1988, at which time she became an assistant professor at the University of Michigan. Seifert was promoted to associate professor in 1994 and a full professor in 2001. In approximately 2006 she was appointed Arthur F. Thurnau Professor of Psychology, which was a distinction based on research and teaching.

Seifert was not a practicing clinical psychologist; instead, her expertise was in human learning and memory, including determining how exposure to information alters the way an individual learns and changes how an individual feels he or she knows about a situation. Seifert explained: "I'm going to provide scientific evidence that says people under stress don't have great memory. They have less accurate memory than you expect for an individual face. Most people believe under stress you have better memory. So it would be helpful to the jurors to know that is not how memory works."

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The party proffering the expert's testimony must persuade the court that the expert possesses specialized knowledge which will aid the trier of fact in understanding the evidence or determining a fact in issue." *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986).

---

[1] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 57; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Because the critical inquiry is whether the expert's testimony will aid the factfinder, the expert testimony must touch on something "beyond common knowledge":

> [W]hether expert testimony is beyond the ken of common knowledge is a commonsense inquiry that focuses on whether the proposed expert testimony is on a matter that would be commonly understood by the average person. If the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute, then expert testimony is unnecessary. [*Kowalski*, 492 Mich at 123 (footnote omitted).]

The *Kowalski* Court further noted:

> We agree with the dissent that questions of eyewitness identification, fading memories, witnesses' body language, and the like involve obvious human behavior from which jurors can make "commonsense credibility determinations." None of this behavior is recognized in our law as having special indicia of reliability. A statement against penal interest, on the other hand, is presupposed to be trustworthy and credible, which is precisely why an alleged false confession is a counterintuitive behavior that may, like other counterintuitive behavior recognized by our caselaw, require the aid of expertise to explain. The legal principles that *are* the foundation of our holding do not also support the need for expert testimony to explain the common human behavior described by the dissent. [*Kowalski*, 492 Mich at 143 (footnoted omitted).]

The trial court did not abuse its discretion when it refused to permit Seifert to testify regarding memory. While *Kowalski* does not appear to *compel* a finding that expert testimony on eyewitness observations is per se inadmissible, the Michigan Supreme Court in *Kowalski* took the view that expert testimony is not required to explain the common human behavior intrinsic to eyewitness identification.

Blake relies on the dissent in *People v Blevins*, 314 Mich App 339; 886 NW2d 456 (2016) (Shapiro, J., dissenting), in arguing that the trial court erred in denying his request for an expert witness. The *Blevins* Court held that Blevins' attorney was not ineffective for failing to call an expert witness and that his in-court identification was not the product of impermissibly suggestive pretrial procedures. In his dissent, Judge Shapiro noted:

> It is undisputed that this case turned exclusively on the jury's evaluation of eyewitness identification testimony. There was no forensic evidence linking Blevins to the gun, no evidence of robbery, and no evidence of any prior bad blood between Blevins and the victims. Although Blevins's attorney conceded that Blevins was among the group of men standing with King, there was no evidence that anyone in the group, other than the man who handed him the gun, did anything to assist King in the crimes. Thus, the question of identification was not whether Blevins was present. Instead, the question was whether Blevins was the man who displayed a gun and then gave it to King before the shooting. I agree with the majority that the evaluation of a witness's honesty is one exclusively for

the jury; they, not we, hear and see the witnesses and are in the best position to make such determinations. However, the majority fails to distinguish between the issues of truthfulness and reliability. Unlike truthfulness, questions of reliability turn on factors other than the good faith and subjective honesty of the witness. [*Blevins*, 314 Mich App at 364–365 (Shapiro, J., dissenting).]

However, the case before the panel is distinguishable from *Blevins*. Whereas the jury convicted the defendant in *Blevins* on eyewitness testimony alone, the jury in this case had forensic evidence and testimonial evidence other than eyewitness testimony to consider, all of which supported the eyewitness identification testimony. Taylor's footprint was found at the Subway restaurant. He and Blake were arrested the following day. A mask and a white gardening glove were recovered from the vehicle in which they were riding. Taylor's DNA was found on both. Therefore, although the points made by the dissent in *Blevins* are well received as the science on the issue of eyewitness identification becomes more settled, they are simply inapplicable to this case.

As for Blake's alternative claim that counsel was ineffective for failing to have Seifert watch the videos or speak with witnesses, such an argument runs completely contrary to Seifert's own testimony. When the trial court asked Seifert how she could render an opinion without speaking to the witnesses, she reminded the court and "it's not the question of identifying how likely is this witness to be accurate. The question is how likely are witnesses to be accurate in circumstances like these." Therefore, unlike *Kowalski* where particular personality traits of an individual were relevant in determining whether he was susceptible to making a false confession, Seifert would testify on the generally accepted scientific principles of memory. She was not offering an opinion that the witnesses in this case made inaccurate identifications; she only wanted to dispel common misconceptions about how memory works. As such, counsel's failure to present Seifert with the videos or have Seifert speak with the witnesses was of no moment.

## C. IN COURT IDENTIFICATION

Blake argues that the trial court erred in permitting Michael to identify Blake during trial because Michael's previous in-court identification of Blake at the preliminary examination was unduly suggestive and there was no independent basis for the identification.

"A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous." *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *Id.* Any issues of law related to this decision are reviewed de novo. *Id.*

"An identification procedure that is unnecessarily suggestive and conducive to irreparable misidentification constitutes a denial of due process." *People v Williams*, 244 Mich App 533, 542; 624 NW2d 575 (2001); see also *Stovall v Denno*, 388 US 293, 301-302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967). The fairness or suggestiveness of an identification procedure is evaluated in light of the totality of the circumstances to determine whether the procedure was so impermissibly suggestive that it led to a substantial likelihood of misidentification. *Williams*, 244 Mich App at 542. "The fact that the prior confrontation occurred during the preliminary

examination, as opposed to a pretrial lineup or showup, does not necessarily mean that it cannot be considered unduly suggestive." *People v Leverette,* 112 Mich App 142, 154; 315 NW2d 876 (1982); see also *People v Colon*, 233 Mich App 295, 304; 591 NW2d 692 (1998).

If a witness is exposed to an impermissibly suggestive pretrial lineup or showup, his in-court identification of the defendant will not be allowed unless the prosecutor shows by clear and convincing evidence that the in-court identification would be sufficiently independent to purge the taint of the illegal identification. *People v Gray,* 457 Mich 107, 115; 577 NW2d 92 (1998); *People v Kachar,* 400 Mich 78, 95-97; 252 NW2d 807 (1977). Whether an independent basis exists is determined by considering the totality of the following factors:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factors affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification.

4. Accuracy or discrepancies in the pre-lineup or show-up description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. . . . [T]he nature of the alleged offense and the physical and psychological state of the victim. "In *critical situations* perception will become distorted and any *strong* emotion (as opposed to mildly emotional experiences) will affect not only what and how much we *perceive*, but also will affect our *memory* of what occurred."

Factors such as "*fatigue, nervous exhaustion, alcohol and drugs*", and age and intelligence of the witness are obviously relevant.

8. Any idiosyncratic or special features of defendant. [*Gray,* 457 Mich at 116, quoting *Kachar*, 400 Mich 78.]

The trial court did not err in denying Blake's motion to suppress Michael's identification testimony. At the hearing on Blake's motion to suppress the identification, Michael testified that he started his shift at Subway at 4:00 p.m. and was working until closing, which was 10:00 p.m. In preparing to close, Michael was near the back of the store, sweeping and mopping. His manager, Samantha, was there, as was her father, Allen. At approximately 9:40 p.m., two men entered the store. Michael testified that the first individual "just came forward and then stood there for a little bit and then eventually came towards me." Michael could only see the individual's face from the eyes down because the individual was wearing a hoodie. They were standing approximately four feet apart. After approximately ten seconds, the individual pulled

-12-

out a gun and walked towards Michael. Michael knew it was a robbery because of the gun and because he saw a second individual who was wearing a mask.

The gunman asked Allen to join Michael near the back of the store. Michael was able to observe the gunman's face the entire time. They were never more than four or five feet apart. The gunman asked both men to throw their money on the floor. Michael threw down his loose change. The entire transaction lasted approximately 5 minutes. The lighting in the store was good. Michael was scared, but calm. He was not under the influence of drugs or alcohol and did not wear prescription glasses or contacts. The only time Michael couldn't see the gunman's face was when the gunman bent over to pick up the money.

In his written statement following the robbery, Michael indicated that the gunman was in his mid-20's, had a medium build, and was approximately his height, which was 5'10. He also described the gunman as having blonde hair. Michael listened to a voicemail about a March 25, 2016, live line-up only after the line-up had taken place; he did not attend. Nor was he presented with a photo array. At Taylor's February 9, 2016, preliminary examination, Michael described the gunman as 5'10 and stocky. The first time Michael was asked to identify the gunman was at Blake's April 2016 preliminary examination. Michael said that he was "certain" or "pretty certain" that Blake was the gunman at the time of the hearing.

Given Michael's testimony regarding his ability to clearly view Blake during the entirety of the Subway robbery, there was an independent basis for his identification and no substantial likelihood of misidentification.

## D. SENTENCING

Blake challenges the scoring of prior record variable ("PRV") 2 and offense variable ("OV") 4.

A trial court's scoring decision must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). This Court reviews the trial court's factual determinations for clear error. *Id.* "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.*

### 1. PRV 2

Blake argues that the trial court improperly scored PRV 2 at 30 points based on offenses that were covered under the Holmes Youthful Trainee Act ("HYTA"), MCL 762.11 *et seq.*

Prior record variable 2 of the sentencing guidelines addresses prior low severity felony convictions. MCL 777.52(1). Under PRV 2, a court must assess points for the circumstance, with the highest number of pertinent points. Here, the trial court scored 30 points because Blake had "four or more prior low severity felony convictions." MCL 777.52(1)(a). Blake argues that, like the defendant in *People v Temelkoski,* 501 Mich 960; 905 NW2d 593, 594 (2018), Blake was induced by HYTA to plead guilty in order to obtain certain benefits from the plea. *People v Garner*, 215 Mich App 218; 544 NW2d 478 (1996), previously provided that HYTA status did not constitute a conviction for the purpose of scoring the judicial guidelines.

A "conviction" includes assignment to youthful trainee status. MCL 777.50(4)(a) ("'Conviction' includes . . . Assignment to youthful trainee status under sections 11 to 15 of chapter II). In *People v Williams*, 298 Mich App 121, 125; 825 NW2d 671 (2012), this Court specifically rejected Blake's argument:

> Defendant relies on *People v Garner,* 215 Mich App 218, 220; 544 NW2d 478 (1996), in which this Court, citing MCL 762.14(2), held that assignment of youthful trainee status did not constitute a conviction for the purpose of scoring the judicial guidelines then in effect. However, *Garner* was decided two years before the Legislature enacted MCL 777.50, subsection (4)(*i*) of which defines "conviction" to include assignment to youthful trainee status for purposes of scoring PRV 1. See 1998 PA 317. [*Williams*, 298 Mich App at 125–126.]

Blake nevertheless looks for support in the Michigan Supreme Court's decision in *Temelkoski*. At issue in that case was the fact that the Sex Offender Registration Act ("SOMA"), MCL 28.721 *et seq.*, retroactively defined the defendant's completion of HYTA as a "conviction" for purposes of registration and obligation under the SORA. The Court noted that while SORA was only a "civil consequence" of conviction, the defendant nevertheless pleaded in reliance on the fact that successful completion of youth training would result in not having a conviction or any other related civil consequences. *Temelkoski*, 501 Mich 960. The Court concluded:

> Because defendant pleaded guilty on the basis of the inducement provided in HYTA as effective in 1994 (i.e., before SORA's effective date), was assigned to HYTA training by the trial judge, and successfully completed his HYTA training, retroactive application of SORA deprived defendant of the benefits under HYTA to which he was entitled and therefore violated his constitutional right to due process. US Const, Am XIV; Const 1963, art 1, § 17. See *Jideonwo v Immigration & Naturalization Serv.*, 224 F 3d 692, 700 n 7 (CA 7, 2000) (noting that "where retroactive application of a statute disturbs settled expectations based on the state of the law upon which a party relied at the time an action was taken such that 'manifest injustice' would result, the Due Process Clause prohibits retroactive application of the law."). [*Id.*]

*Temelkoski* is inapplicable to Blake's PRV 2 sentencing issue. As the prosecutor correctly notes, MCL 777.50(4)(a)(i), which defines "conviction" was enacted in 1998, well before Blake's 2011 plea. As such, Blake cannot argue that he pleaded in reliance on the fact that completing youthful training would result in a lack of conviction.

### 2. OV 4

Blake argues that the trial court scored OV 4 in an indiscriminate and casual way.

OV 4 applies to "psychological injury to a victim." MCL 777.34(1). "OV 4 is correctly scored at 10 points when a 'serious psychological injury requiring professional treatment occurred to a victim.'" *People v White*, 501 Mich 160, 163; 905 NW2d 228 (2017), quoting MCL 777.34(1)(a). In determining the sentencing guidelines, courts may consider the entire

record, including the presentence investigation report, a defendant's admission at the plea examination or trial, and evidence introduced during a preliminary examination or trial. *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012).

"[A] trial court 'may not simply assume that someone in the victim's position would have suffered psychological harm because MCL 777.34 requires that serious psychological injury *occurred* to a victim, not that a *reasonable* person in that situation would have suffered a 'serious psychological injury.' " *White*, 501 Mich at 163-164, quoting *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012). Moreover, "a victim's fear during a crime, *by itself and without any other showing of psychological harm*, is sufficient to assess 10 points for OV 4." *White*, 501 Mich 164. This is true because "[w]hile crime victims are often obviously, and understandably, frightened when a crime is being perpetrated, this fear does not necessarily result in a 'serious psychological injury' and, as addressed earlier, a court cannot merely assume that a victim has suffered a 'serious psychological injury' solely because of the characteristics of the crime." *Id*. at 164–165. However, the trial court may assess 10 points for OV 4 when the injury caused by the crime continues after the completion of the crime itself. See *People v Wellman*, 320 Mich App 603, 611-612; 910 NW2d 304 (2017). Additionally, the fact that the victim did not seek professional treatment is not conclusive, and an assessment of 10 points is appropriate when there is "some evidence of psychological injury on the record to justify a 10-point score." *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012).

This Court has upheld the assessment of 10 points for OV 4 when a victim impact statement disclosed feelings of anger, hurt, violation, and fear after the crime. *People v Williams*, 298 Mich App 121, 124; 825 NW2d 671 (2012). This Court has also upheld the assessment of 10 points for OV 4 when the victim indicated that he suffered from depression and changes in personality after the crime. *People v Ericksen*, 288 Mich App 192, 203; 793 NW2d 120 (2010).

The evidence presented relating to the victims' psychological injury was a sufficient showing of psychological harm to assess 10 points for OV 4. Two of the victims expressed continued anxiety as a result of the robberies and one expressed an inability to sleep. The victim impact statements were sufficient to find psychological injury requiring treatment by a preponderance of the evidence.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Kirsten Frank Kelly
/s/ Jonathan Tukel